# In the United States Court of Federal Claims

**No. 14-106T**
**Filed: December 13, 2016**

| | |
|---|---|
| * * * * * * * * * * * * * * * * | |
| **MARK V. NOFFKE,** | |
| | **Trial; Tax; 26 U.S.C. § 6672;** |
| **Plaintiff,** | **Responsible Person; Willfulness.** |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant.** | |
| * * * * * * * * * * * * * * * * | |

**Michael E. Shaff**, Irvine Venture Law Firm, LLP, Irvine, CA.

**S. Starling Marshall**, Trial Attorney, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C. for the defendant. With her were **Brian J. Sullivan**, Trial Attorney; Court of Federal Claims Section; **G. Robson Stewart**, Assistant Chief, Court of Federal Claims Section, **David I. Pincus**, Chief, Court of Federal Claims Section and **Caroline Ciraolo**, Deputy Principal Deputy Assistant Attorney General, Tax Division, United States Department of Justice.

# O P I N I O N

### HORN, J.

The plaintiff, Mark V. Noffke, brought suit in the United States Court of Federal Claims to recover funds for all four quarters of 2009, after the Internal Revenue Service (IRS) determined that plaintiff was a responsible person to pay employment taxes for BOOMj.com, Inc. (BOOMj),[1] and "plaintiff paid the trust fund portion of the employment tax for one employee for the first, second, third and fourth quarters of 2009 for BOOMj." Mr. Noffke seeks the refund of the employment taxes paid, and the government has counterclaimed for the unpaid portions of the assessments. A trial was held and post-trial briefings on the legal and factual issues raised in the case were filed by both parties. After a review of the trial testimony, the exhibits entered into the record, and the submissions filed by the parties, the court makes the following findings of fact.

---

[1] As the parties have stipulated, "BOOMj changed its name to 'Beyond Commerce, Inc.' in December of 2008, but continued to be referred to as 'BOOMj' and 'Beyond Commerce.'" As the parties typically refer to the corporation as BOOMj, the court also does so in this opinion, unless quoting from a document or the trial transcript.

**FINDINGS OF FACT**

The plaintiff, Mark J. Noffke, has been a certified public accountant since 1980.[2] At trial, plaintiff explained that:

> I'm an accountant, CPA. I've been in the accounting industry since 1977. I've run public companies. I've been involved with many types of transactions, start-ups, but the majority of the start-ups I've been involved with are companies that deal in the public arena. I've gone through a lot of various transactions in the various businesses that we've dealt with.

In addition to being a certified public accountant, plaintiff testified that he also has been the chief financial officer of a number of corporations.[3] Specifically, plaintiff testified: "I was the chief financial officer for the forest division of Stone Container. That company then was spun off in 1996 . . . and I was the CFO of the U.S Forest Industries. Their revenue was around $300 million, about 600 employees throughout that region." The parties have stipulated that "[a]s CFO of U.S. Forest Industries from 1996 to 2002, plaintiff's group was responsible for ensuring that employment taxes were deposited." In addition, plaintiff served as Chief Financial Officer of National Storm Management, and the parties also have stipulated that "[a]s CFO of National Storm Management from 2004 and 2005, plaintiff had responsibility for ensuring that payroll taxes were paid."

After serving as Chief Financial Officer of BOOMj,[4] plaintiff testified, "I've been the chief financial officer of a company just recently that I resigned from, a company called EFactor. And presently I'm the -- the chief financial officer of a company called Flying Food Fare, Inc., which is an airline catering business based in Chicago." In sum, plaintiff testified that he has served as chief financial officer of seven different companies. Regarding BOOMj, the parties have stipulated that Mr. Noffke "became CFO and

---

[2] The court notes that, although the parties have stipulated that Mr. Noffke has been a certified public accountant since 1980, during the trial, Mr. Noffke testified that he has been a certified public accountant "since 1981," and, as of 2016, that he had been in the accounting business for "a little bit more" than thirty years," which is inconsistent with his testimony that he has "been in the accounting industry since 1977." Although the fact that Mr. Noffke is a certified public accountant is relevant to the court's determination, as are his years of experience, neither the precise year he was certified as a public accountant, nor the exact number of years he has been involved in the accounting industry are important.

[3] Although not discussed at trial, the parties also have stipulated that "Plaintiff has an accounting bachelors' degree and has taken post-graduate management courses at Northwestern University [sic] and Emory University's business schools."

[4] As discussed further below, after BOOMj ceased operations in 2009, a subsidiary of BOOMj, Kaching Kaching, Inc., purchased certain assets of BOOMj for 20.8% of the shares of common stock of Kaching Kaching, Inc., and plaintiff became the Chief Financial Officer of Kaching Kaching, Inc.

executive vice-president of BOOMj.com, Inc., an online services company aimed at baby-boomers in 2007." (internal reference omitted). Regarding the beginning of his employment, Mr. Noffke testified at trial on cross-examination:

> Q. Now, you -- when BoomJ began, came into existence, you were one of the original members of the executive team; is that right?
>
> A. That's correct.
>
> Q. And Mr. McNulty was as well.
>
> A. That's correct.
>
> Q. But was Mr. -- you were -- you were issued stock; is that right?
>
> A. At a point in time, correct.
>
> Q. Okay. At the beginning of the company's existence.
>
> A. That's correct.

In response to the question on cross-examination, "when you took on this -- this role as CFO of -- of BoomJ, did you understand that that was a potential -- that -- that a role such as that could carry a potential personal liability should there be nonemployment -- nonpayment of employment taxes?" Mr. Noffke answered: "Yes, I did."

> Regarding the formation of BOOMj, plaintiff testified:
>
> BoomJ was formed in 2006 as an offshoot of a company called Financial Media Group. The company was a private company until 2007 when it did what was called a reverse merger[5] with -- with what's called a shell company. A shell company is a company that is set up for public reporting. It's gone through the SEC. It has received the various blessings that it can be a publicly reporting company which requires three years of audited financial statements and various disclosure documents on a business plan. Well, this company had basically come into what was called a shell status, did not have any liabilities on it. And what we did is we exchanged stock within BoomJ for the stock of this public entity. This entity, then we changed its name then to BoomJ, and then further changed it to a company called Beyond Commerce.

Mr. Noffke testified that "[i]nitially I owned a million shares of BoomJ as the private company. That was then converted into -- it was a reverse merger of 2.02, so converted into 2,200,000 shares. . . ."

---

[5] Mr. Noffke subsequently testified that "[t]he reverse merger took place sometime during the period of -- of 2007."

Explaining the relationship between the various entities, Mr. Noffke testified that:

Beyond Commerce is the public vehicle that was the trading vehicle where the stock was. BoomJ.com is a subsidiary 100 percent owned by Beyond Commerce. Beyond Commerce actually owned 100 percent of Local Ad Link, the I Supply company,[6] and two other facilities or entities. But the ultimate parent was Beyond Commerce that owned all these other various companies.

Mr. Noffke served as Chief Financial Officer of BOOMj, Beyond Commerce, and Local Ad Link. Mr. Noffke testified that he was "secretary-treasurer at a point in time" of BOOMj and the various entities. In response to the question: "Were you executive vice president and chief financial officer of each of those entities?" Mr. Noffke replied:

I was most likely the treasurer-secretary of each one of those entities not necessarily the CFO, but that legal capacity.

Q. Were you -- were you CFO of any of these entities? I thought --

A. I don't believe there was a CFO for those positions, and we were just -- again, these were legal entities, and so whatever legal entity it required, that's what position I was for that. Again, being Beyond Commerce and CFO of the holding company and owning 100 percent of the stock of each one of these.

Q. So you were CFO of Beyond Commerce, and were you CFO of BoomJ as well?

A. That's correct.

Q. Okay. And then for Local Ad Link and I Supply, you're just saying you don't know what was legally required for them --

A. Whatever was legally required, whether it was a treasurer or just -- I was either treasurer or secretary of that -- of those entities.

Q. What about executive vice president? Were you executive vice president of any of those entities?

A. Not to my knowledge.

Robert McNulty started BOOMj, and testified that, initially, he served as "the chairman of the company, nonexecutive chairman." Mr. McNulty explained that in his role as nonexecutive chairman, "[p]rincipally I worked on the side of the business which was the business strategy, business model, and, you know, the direction of the company from

---

[6] The name of the entity is iSupply.

that standpoint, and then raising capital for the company." Mr. McNulty testified that "George Pursglove was the CEO, and Mark Noffke was the CFO" of BOOMj. Mr. Pursglove testified that he was the Chief Executive Officer and President of BOOMj. Mr. Pursglove also testified that he formed BOOMj with Mr. McNulty and "the first file I set up on BoomJ was October 1st, 2006." Ultimately, Mr. McNulty became Chief Executive Officer of BOOMj after Mr. Pursglove left BOOMj in October 2007.[7] Mr. McNulty described his management style by stating:

> I'm very direct, you know. Some people think I'm a tough guy to work for. Some people think I'm not so tough to work for. If you do your job, guess what, I'm the easiest guy in the world to work for. If you don't do your job, you probably won't be here very long.

The parties have stipulated that "Mr. McNulty had been subject to a sanction by the Securities and Exchange Commission (SEC) as a result of not disclosing an inter-company transfer to the SEC and that, as a result, Mr. McNulty could not serve as the chairman of the board of a public reporting company."[8]

The parties also have stipulated that Mr. Noffke had check signing authority on all of BOOMj's bank accounts, as well as on all BOOMj's subsidiaries' bank accounts, and Mr. Noffke testified to the same at the trial.[9] Mr. Noffke also testified that, in addition to hand signing checks, BOOMj had a check signing machine with Mr. Noffke's signature, and that was with "what the majority of the checks were written." The parties have stipulated

---

[7] Despite parting from BOOMj nine years before the trial, Mr. Pursglove and Mr. McNulty continue to have a strained relationship. In response to a question about Mr. McNulty's honesty, Mr. Pursglove stated that "He [Mr. McNulty] wouldn't know how to spell it, No. 1, and he wouldn't know honesty if it was staring him in the face, and he wouldn't know it was honesty if St. Peter himself was delivering it to him." Mr. McNulty, for his part, testified regarding Mr. Pursglove:

> He resigned from the company. I mean, I saw a significant difference in his attitude over a period of maybe a quarter or so. You know, in raising capital, things don't work. But at the end of the day, you know, you either believe in the business, get committed and go forward, or don't. At some point, he [Mr. Pursglove] decided that to leave the company, wasn't in his best interest to stay there. However, shortly after he left, I found that he was actually working on a plan to compete with our business model and -- and had reached out to people to raise capital and things like that.

[8] The parties also stipulated that "[a]t BOOMj, the lawyers the company hired researched Mr. McNulty's restrictions and determined that he could serve as chairman of the board."

[9] Mr. Noffke indicated that for a time, he may have been the only individual with check signing authority at BOOMj. He testified: "I don't recall who else may have been added. I might have just been the sole one at a point in time. So I really don't recall. . . ."

that Mr. McNulty did not have check signing authority on BOOMj's bank accounts.[10] On cross-examination, defendant's counsel asked Mr. Noffke why he did not simply write a check to the IRS to the cover the requisite taxes, to which he responded:

> First of all, I didn't have the authority to do that. I mean--and, frankly, why am I doing that? It's a personal obligation I'm taking care of. That's almost--you know, that's determinative embezzlement almost, because it was outside of my authority. And most likely would have only taken care of--it would have bounced. It was--the funds were very, very tight. There was not a million dollars sitting in the account at any point in time. There was only amounts--the amounts that were in the checking account, there were checks that were already issued for that.

Mr. McNulty testified, in response to the question, did Mr. Noffke have the authority to write a check to the IRS, "I mean, the question really shouldn't be does he have authority. Of course he has authority to write a check. It's, you know, who's telling him to pay them or not telling them to pay."[11] Regarding his ability to make payments to the IRS that Mr. McNulty did not approve, Mr. Noffke testified:

> Well, first of all, I didn't have the authority to do that. And could have -- you can say that I was embezzling money to take care of my personal liability with the IRS. It would not cover the full debt that we were owed, and it would handle a certain portion of that. And the -- the liability would still be -- there would still be a -- a liability out there, maybe reduced by whatever money I was able to hypothetically write to.

Joanne Stiff[12] testified that, as "an officer of the company," Mr. Noffke had the authority to open and close bank accounts. The parties also have stipulated that "Plaintiff opened and closed bank accounts, merchant credit card holding accounts, credit cards and other financial accounts on behalf of BOOMj" and that "Plaintiff had the ability with respect to its banks to direct electronic transfers from BOOMj and its subsidiaries' bank accounts." The parties further stipulated that "Plaintiff negotiated settlements with

---

[10] At trial, Mr. McNulty was asked is "there a reason that you were not a signer on the BoomJ checking account?" and Mr. McNulty replied: "No, not particularly." Mr. McNulty further explained: "I mean, I didn't control it from writing the check, but I controlled it from discussing issues with Mark [Noffke] and directing them who should get paid and who shouldn't get paid."

[11] The parties have stipulated that "Plaintiff and Mr. McNulty authorized payroll at BOOMj."

[12] Regarding Ms. Stiff, Mr. Noffke testified that "she actually did the payroll, was responsible for the filing of the payroll taxes, the reporting of the payroll taxes, the actual entry of some of the accounts payable, and the supervision of some of the accounts payable functions, the actual generation of the check, printing or preparing a check." Moreover, the parties have stipulated that "plaintiff hired Joanne Stiff to manage BOOMj's accounts payable, payroll, bank reconciliations and other functions."

creditors and former employees on behalf of BOOMj." Mr. Noffke testified that "[t]he accounting department reported up through me" and that he had hired, and subsequently fired, at least one individual. Mr. Noffke hired Patricia Hill to be corporate controller of BOOMj in 2007, and she remained in that role until he fired her 2009. Moreover, Mr. Noffke also had extensive responsibilities regarding BOOMj's public reporting with the Securities and Exchange Commission.  Plaintiff testified, "I would estimate basically 80 percent of my duties were in the public reporting framework."

The parties stipulated that "[f]rom its inception, BOOMj experienced peaks and valleys of funding and cash flow was an issue," and that "[i]n 2008, plaintiff was aware that BOOMj had not made complete and timely employment tax deposits with the United States government." Mr. Noffke sent the IRS a letter on March 9, 2009, "requesting an abatement of the penalties charged for the reasons of hardship and former disgruntle [sic] employees." In his letter to the IRS, Mr. Noffke stated that the former employees

> did not file the required documents or pay the payroll taxes, as it was assured to me by the Accounting Manager. Boomj has subsequently filed all 941 tax forms for the third and fourth quarter [of 2008]; however, our business was suffering at this point in time. Our business structure is based on e-commerce and with the slowness of the economy, our revenues have lowered.

The parties also stipulated that "[t]he 2008 employment tax liabilities were eventually paid." Mr. Noffke testified that after the 2008 employment tax liabilities were paid, changes were made to the accounting department, specifically, "[t]he changes were that we started putting that up in front as an item to be paid versus prior to that, it was understood when you made payroll, you made -- you -- that was including payroll taxes." On cross-examination Mr. Noffke testified that:

> Q. And then from that point on, there was a discussion of that [employment tax liabilities].
>
> A. That's correct.
>
> Q. And -- but from that point on, you understand that in '09, none of the quarters were -- the obligation was fully met.
>
> A. That's correct. But they were presented again to -- to Bob McNulty to make that call whether to make those payments or not. So that was -- if you want to say a change, there was a change. It was a change that identified that these are certain obligations that need to be paid now.

In 2009, BOOMj faced similar issues regarding timely employment tax deposits with the United States government. On cross-examination, defendant's counsel had the following exchange with Mr. McNulty:

Q. [D]uring 2009 when there were these issues with capital infusions and there were payroll taxes that -- liabilities that were going unpaid, you -- you did continue to make payroll to your employees.

A. Yes.

Q. And Mr. Noffke was aware of that.

A. Yes.[13]

Mr. McNulty testified, in response to the question, "[s]o were there more than -- there was more than one conversation with Mr. Noffke about the fact that IRS was going to go unpaid," that:

Yeah. And we always thought we were going to get money and going to pay it. But never came in. We were always short and, you know, you have to have kind of a -- and I know there's no excuse in the law, but you have to have an optimistic view to build these companies or you wouldn't be doing them. So you promise that you're going to have funding done. It doesn't happen.

In explaining the process for not making the required payments to the IRS, Mr. McNulty explained:

Mark [Noffke] informed me on all payables, whether it's, you know, payroll taxes or whatever it might be. In this specific case, the sequence of events was pretty straightforward. Joanne [Stiff] came to me and said, hey, we have -- you know, we have an obligation to pay, you know, taxes, and we have an obligation for payroll, but we're going to be short. What should we do? And I said, you know, go ahead and, you know, pay the payroll, hold the taxes, and I'll call Mark. And I called Mark and told him here's where we are. OmniReliant's[14] committed to put money in, we're about a week away from putting cash in, and, you know, if -- if you miss a payroll 1099, and -- you know, sales reps, you start to destroy your business, so -- and we were ramping the business up so we had significant payroll to make. So I had a choice to make. And, you know, they were reluctant to -- to go along with it obviously because of the liability issue. But I just said, Look, we -- you know, it's a decision I have to make. And, you know, we need to pay payroll. It's that simple. And they were not happy with it, particularly Mark. I remember talking to him on the phone.

---

[13] The joint exhibits include an IRS Form 433-B, which reflects that Mr. Noffke was "Responsible for Depositing Payroll Taxes."

[14] OmniReliant was an investor in BOOMj. After BOOMj experienced financial difficulties, Local Ad Link was sold to a subsidiary of OmniReliant.

Thereafter, plaintiff's counsel asked Mr. McNulty:

> Q. And he [Mr. Noffke] expressed his views that the -- the federal employment taxes should be paid[.]
>
> A. Yes, he did.
>
> Q. Yet they were not.
>
> A. Correct. It's my responsibility. It's just that simple.

After acknowledging that Mr. Noffke was upset that the employment tax liabilities were not being paid, Mr. McNulty had the following exchange with defendant's counsel:

> Q. Did he [Mr. Noffke] ever threaten to just issue a payment to the IRS for the unpaid obligations?
>
> A. No.
>
> Q. Did he ever threaten to quit and resign his position?
>
> A. He didn't threaten to quit, but he made it pretty clear that he was very unhappy about it.
>
> Q. And did –
>
> A. Mark's not the kind of guy that just relinquishes and rolls over. You know, he felt there was a real responsibility to the company. If he left, who's going to run it from that standpoint? I can't run the accounting department.

Mr. McNulty expressed surprise that Mr. Noffke, and not himself, was the individual the IRS assessed the trust fund recovery penalties against, testifying, "[f]rankly, I assumed that the government was coming after me," and "I never thought they were going after Mark. And they didn't. They didn't come after me, which surprised me."

Mr. Noffke also discussed the conversations he had with Mr. McNulty about not paying the employment tax liabilities with defendant's counsel:

> Q. we've talked a lot today about Mr. McNulty and what he would say to you when you would have these conversations about wanting to pay the employment tax liabilities, and I think you said he was always saying that money was just around -- around the corner; is that right?
>
> A. That's correct.

Q. And this is referring -- you heard how many times in your work with Mr. McNulty?

A. Many -- many times.

Q. Over the course -- I guess beginning in 2008 when you first --

A. Beginning in 2008 when we first incurred missing the payroll liability the first time. And actually that happened in 2008, the promise was fulfilled. We were able to pay those payroll taxes in 2008 in 2009.

Q. Right. But the same was not true of the employment tax liabilities incurred in 2009.

A. That's correct.

Mr. Noffke discussed the non-payment of federal taxes further with plaintiff's counsel:

Q. Would you say that you urged Mr. McNulty to pay the federal employment taxes?

A. Yes, I would.

Q. How often would you urge him to pay the federal employment taxes?

A. It was front and center every time he received one of our sheets.

Q. And how often was that?

A. Traditionally weekly. We tried to make payments on Fridays.

. . .

Did the tenor of your discussions with Mr. McNulty change from the beginning of 2009 to the end of 2009 regarding employment taxes?

A. Yes, it did.

Q. Would you tell the Court.

A. It got a little bit more intense because of -- the dollar amount was getting extremely high. And Bob [McNulty] -- again, it's always the next deal. We heard him talk about, I would do this again. I -- you know, he -- he's still believe -- I mean, I'm looking at more realistic. I'm looking at what are our liabilities and how do you take care of the various vendors, suppliers, payroll, you know, trust fund obligations to -- basically to the point of, you know -- you know, is  this money ever going to come in? When does it stop?

On November 2, 2009, the IRS sent BOOMj a notice regarding the first quarter of 2009, which stated in part:

> Our records indicate that you haven't paid the amount you owe.  The law requires that you pay your tax at the time you file your return.  This is your notice, as required by Internal Revenue Code Section 6331(d), of our intent to levy (take) any state tax refunds that you may be entitled to if we don't receive your payment in full.  In addition, we will begin to search for other assets we may levy.  We can also file a Notice of Federal Tax Lien, if we haven't already done so.

At the end of 2009, BOOMj "ceased operations and no longer had employees." The parties have stipulated that "[a]t the end of 2009, Mr. McNulty set up an arrangement whereby a subsidiary of BOOMj, called Kaching Kaching, Inc. ('KCKC') purchased certain assets of BOOMj for 20.8% of the shares of common stock of KCKC." Mr. Noffke became the Chief Financial Officer of Kaching Kaching, Inc. and Mr. McNulty became the Chief Executive Officer.[15]

In February 2010, Mr. Noffke sent a letter to President Obama requesting the president "waive any back taxes due and allow the officers clemency on any personal obligations." Mr. Noffke explained that:

> Beyond Commerce, Inc. during 2009 embarked on an incredibly complex and significant transformation as we fundamentally shifted our business model from a social-shopping portal to a local advertising and e-commerce company. During the first quarter of 2009 at our peak we had over one hundred salary individuals and over 35,000 independent sales representatives selling local advertising on the internet through our Local Ad Link, Inc. LocalAdLink was an online business directory selling ads to small and medium size business [sic] along with user generated customer reviews and placing the ads on Internet search engines Google, Yahoo, and Bing.com.

Mr. Noffke also explained in his letter that:

> However, the Company began going through some very difficult times over the next several months. The downturn can be pinpointed to when the Company was put into a negative position as the Company's credit card merchant cut off its processing just as we were ramping up. The processor withheld much needed cash that forced the Company off line. As a result, this put the Company in a position where it was unable to pay on a timely

---

[15] Although not an issue currently before this court, Kaching Kaching, Inc. also failed to pay the employment tax liabilities for the tax period ending on December 31, 2010, and the IRS assessed Mr. Noffke with a trust fund recovery penalty for that failure.  As indicated below, prior to trial, the parties resolved their dispute regarding the 2010 fourth quarter tax liabilities for Kaching Kaching, Inc.

basis its independent representatives. This subsequently pushed the Company into a slow downward spiral.

Mr. Noffke continued:

> Needless to say payroll taxes were neglected as we were always trying to take care of the field sales representatives and our own employees with the anticipation that the next round of funding or increase in sales could take care of the taxes. The Company Officers did not divert funds or any malice, just invested it back into the business's human assets. I have not received a paycheck for close to four months, have lost all my stock in the company as it was foreclosed on in repayment of a loan, all this as we try to reinvigorate our business.

Mr. Noffke sent the IRS another letter in March 2010, referencing a conversation between the IRS and Ms. Stiff, which indicated

> in the conversation, you were informed that Boomj has not paid payroll for December 2009 and for first quarter 2010. We are in financial hardship and are trying to raise capital for operational needs. We have had to lay off approximately 80% of our staff. At the beginning of 2009, we had a little over 100 employees; we are now operating with about 12-15. Boomj is currently in re-organizing and rebuilding our business model to start bringing in additional revenues as well as capital fund raising. At the moment, Boomjcom's revenues are approximately $3,000.00 gross monthly.

The IRS continued to seek information about the unpaid payroll taxes and Mr. Noffke testified that he brought in an accounting firm to help BOOMj work with the IRS, and in an April 20, 2010 email, a tax manager with the accounting firm requested Mr. Noffke provide a list of monthly income, personal expenses, and a complete Form 4180. The parties have stipulated that "Plaintiff signed a Form 4180 interview form regarding his role at BOOMj and his knowledge of the unpaid liabilities on May 18, 2010." The Form 4180 which is titled: "Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Taxes," asked a series of questions under the heading "Responsibility" and stated: "Please state whether you performed any of the duties / functions listed below for the business and the time periods during which you performed these duties." The questions included: "Determine financial policy for the business?" "Direct or authorize payments of bills/creditors?" "Open or close bank accounts for the business?" "Sign or counter-sign checks?" "Authorize payroll?" "Authorize or make Federal Tax Deposits?" and "Hire/Fire?" All of the above questions were answered in the affirmative, as well as the question: "During the time the delinquent taxes were increasing, or at any time thereafter, were any financial obligations of the business paid," with the explanation: "Standard operational expenses to keep company in business." In response to the question: "Who authorized them to be paid?" the Form 4180 stated: "Mark Noffke."

The parties have stipulated that "[o]n September 20, 2010, the IRS assessed penalties against plaintiff Noffke of $91,252.54 for the first quarter, $208,618.99 for the second quarter, $179,570.87 for the third quarter, and $102,642.10 for the fourth quarter." On January 12, 2011, plaintiff paid the trust fund portion of the employment tax for one employee for the first, second, third and fourth quarters of 2009 for BOOMj, and on the same day, January 12, 2011, plaintiff filed claims for refund for all four quarters of 2009. The parties have stipulated that "[t]he IRS had not taken any action on these claims as of the date of filing the complaint in this action."

Defendant's counterclaim, discussed below, indicated that "plaintiff was assessed a trust fund recovery penalty, pursuant to Internal Revenue Code § 6672, in the amount of $15,402.37. The assessed amount corresponds to a portion of unpaid employment tax obligations of Kaching Kaching Inc. for the tax period ending on December 31, 2010." Subsequently, plaintiff paid the trust fund portion of the employment tax for one employee for the fourth quarter of 2010 for Kaching Kaching Inc., and filed a claim for refund on October 7, 2013. The defendant also indicated that the IRS has not issued a denial of the claim for refund.

On February 6, 2014, plaintiff filed the above captioned case in the United States Court of Federal Claims and sought a "refund of the claimed overpaid federal taxes in the amount of $1,541.69 plus interest,"[16] as well as a determination by the court "that Plaintiff is not a responsible person within the meaning of 26 USC §6672(a)." On June 6, 2014, defendant filed an answer and a counterclaim seeking "judgment against plaintiff in the amount $102,642, plus assessed interest, minus amounts credited by the IRS against plaintiff's § 6672 assessment for the tax periods ending on March 31, 2009, June 30, 2009, September 30, 2009, and December 31, 2009, plus interest and costs allowed by law." On August 7, 2014, plaintiff filed an amended complaint, and in addition to seeking a "refund of the claimed overpaid federal taxes in the amount of $1,541.69 plus interest with respect to the four quarters of trust fund recovery penalty with respect to Boomj.com," plaintiff sought a "refund of the claimed overpaid federal taxes in the amount of $303.40 plus interest with respect to the trust fund recovery penalty with respect to KaChing KaChing for the fourth quarter of 2010." Prior to trial, the parties resolved their dispute regarding the 2010 fourth quarter tax liabilities for Kaching Kaching, Inc.

---

[16] Although plaintiff sought a refund in the amount of "$1,541.69 plus interest," in plaintiff's "Statement for Refund Claim," included as an exhibit to the complaint, plaintiff claimed "[t]he Taxpayer has paid $1,533, representing the withholding for one employee for each Quarter."

**DISCUSSION**

The parties agree that the issue to be resolved is "whether or not plaintiff is liable for the trust fund recovery penalties assessed by the IRS against plaintiff pursuant to Section 6672 for the four quarters of 2009, relating to the unpaid employment taxes of Beyond Commerce, Inc." As recently explained by the United States Court of Appeals for the Federal Circuit:

> Although the United States, as a sovereign, is generally immune from suit, 28 U.S.C. § 1346(a) provides the limited waiver of sovereign immunity for refund suits:
>
> (a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:
>
> (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws. . . .
>
> The Tucker Act, which gives the Claims Court jurisdiction over suits for which the United States has waived its sovereign immunity, provides the Claims Court with jurisdiction for refund suits. 28 U.S.C. § 1491; Shore v. United States, 9 F.3d 1524, 1525 (Fed. Cir. 1993); Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).

Diversified Grp. Inc. v. United States, 841 F.3d 975, 981 (Fed. Cir. 2016).

As noted above, Mr. Noffke has paid the "trust fund portion of the employment tax for one employee for the first, second, third and fourth quarters of 2009 for BOOMj." Generally, "payment of the assessed taxes in full is a prerequisite to bringing a refund claim." Ledford v. United States, 297 F.3d 1378, 1382 (Fed. Cir. 2002) (citing Flora v. United States, 362 U.S. 145, 177, reh'g denied, 362 U.S. 972 (1960); Rocovich v. United States, 933 F.2d 991, 993–94 (Fed. Cir. 1991)); see also Shore v. United States, 9 F.3d 1524, 1527 (Fed. Cir. 1993) ("The Flora [v. United States, 362 U.S. 145] full payment rule requires that taxpayers prepay the tax principal before the Court of Federal Claims will have subject matter jurisdiction over their tax refund action under § 1491."). The Federal Circuit in Diversified Group echoed this sentiment, noting that "[i]n Flora, the Supreme Court determined that § 1346(a)'s jurisdictional grant includes a 'full payment requirement,' which demands—as a jurisdictional prerequisite—full payment of the tax or penalty before a party could sue for a refund." Diversified Grp. Inc. v. United States, 841 F.3d at 981 (quoting Flora v. United States, 362 U.S. at 177). There is, however, an exception to this rule for divisible taxes, such as those levied under 26 U.S.C. § 6672 (2012). See 26 U.S.C. § 6331(i)(2)(B) (2012) (defining divisible taxes to include "the penalty imposed by section 6672"). Under this exception, "a taxpayer assessed under section 6672 need only pay the divisible amount of the penalty assessment attributable

to a single individual's withholding before instituting a refund action." <u>Boynton v. United States</u>, 566 F.2d 50, 52 (9th Cir. 1977); <u>see also</u> <u>Steele v. United States</u>, 280 F.2d 89, 91 (8th Cir. 1960).[17] The rationale for this exception is that "section 6672 assessments represent a cumulation of separable assessments for each employee from whom taxes were withheld." <u>Boynton v. United States</u>, 566 F.2d at 52. Thus, in the past, courts have permitted 26 U.S.C. § 6672 refund cases to proceed when the taxpayer has prepaid the IRS an amount equal to one employee's withholding for one quarter. <u>See</u> <u>Godfrey v. United States</u>, 748 F.2d 1568, 1573 (Fed. Cir. 1984) (noting that the United States Claims Court had allowed the case to proceed after each plaintiff paid $150.00 to the IRS, "the amount in excess of income and FICA taxes withheld from one employee");[18] <u>see also</u> <u>Kennedy v. United States</u>, 95 Fed. Cl. 197, 200 (2010) (noting plaintiff had prepaid $476.15 to the IRS, "representing the portion of the assessment relating to one employee for the fourth quarter of 2000"). Furthermore, defendant has not challenged the propriety of Mr. Noffke seeking a refund after only paying a portion of the taxes owed. In light of the decisions allowing partial payment for a case regarding 26 U.S.C. § 6672, the court believes it is proper for the court to consider Mr. Noffke's claim on the merits. As defendant has not raised any other jurisdictional challenges to Mr. Noffke's suit, the court addresses the merits of plaintiff's tax refund claim.

<u>26 U.S.C. § 6672</u>

The Tax Code at 26 U.S.C. § 6672(a) states, in part:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total

---

[17] The genesis of the exception is dicta in <u>Flora v. United States</u> stating that "excise tax assessments may be divisible into a tax on each transaction or event, so that the full-payment rule would probably require no more than payment of a small amount." <u>Flora v. United States</u>, 362 U.S. at 175 n.38; <u>see also</u> <u>Steele v. United States</u>, 280 F.2d at 90 (citing <u>Flora v. United States</u>, 362 U.S. at 171 n.37, 175 n.38).

[18] Although the Federal Circuit considered the issue of the "divisibility exception" to <u>Flora's</u> full payment rule, and noted that "divisibility remains a 'narrow exception,'" <u>Diversified Grp. Inc. v. United States</u>, 841 F.3d at 982, in that case, the Federal Circuit addressed the issue of the divisibility exception in the context of the IRS conducting a penalty audit, pursuant to 26 U.S.C. § 6707, for the failure to register a tax shelter under 26 U.S.C. § 6111, and did not address 26 U.S.C. § 6672. <u>See</u> <u>Diversified Grp. Inc. v. United States</u>, 841 F.3d at 985 (determining the penalty assessed pursuant to 26 U.S.C. § 6707 is not divisible). A seminal case decided by the Federal Circuit regarding 26 U.S.C. § 6672, <u>Godfrey v. United States</u>, 748 F.2d 1568, did not address if partial payment was a jurisdictional bar to deciding the case, but reached a decision on the merits, despite plaintiff having paid the taxes only "withheld from one employee." <u>Id.</u> at 1573.

amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a); see also Gann v. United States, 128 Fed. Cl. 394, 395 (2016). By way of background, a Judge of the United States Court of Federal Claims explained:

A short explanation of the payroll tax system is useful to place the applicability of section 6672 in context. Under the Federal Tax Deposit System, every employer is required to withhold Federal Insurance Contributions Act (FICA) tax from employees' wages "as and when" they are paid. 26 U.S.C. §§ 3102, 3402(a) (2000). These withholding funds are used primarily to pay the taxpayers' individual income tax as well as Social Security and Medicare benefits. Instead of paying the federal government directly, employers deposit the withheld funds with an authorized financial institution such as a commercial bank until they are collected by the U.S. Treasury. INTERNAL REVENUE SERVICE, PUBLICATION 15, CIRCULAR E, EMPLOYER'S TAX GUIDE (2003). These funds are deposited along with a Federal Tax Deposit (FTD) coupon listing the employer's name, address, and Employer Identification Number (EIN), which allows the IRS to earmark and track the deposits. Id. Under the Internal Revenue Code, the deposited withholdings "shall be held to be a special fund in trust for the United States." 26 U.S.C. § 7501(a). Hence, the withheld taxes are commonly referred to as "trust fund taxes," although the trust established is somewhat different than a traditional common law trust. INTERNAL REVENUE SERVICE, SMALL BUS/SELF–EMPLOYED, BUSINESS WITH EMPLOYEES, TRUST FUND TAXES (2003). These trust fund tax deposits are accounted for by the IRS on a quarterly basis through the use of a tax return form known as "Form 941." Employers must file Form 941 within one month from the end of the prior quarter, and penalties are assessed for late filings. Id. More importantly for the purposes of this case, however, employers are liable under 26 U.S.C. §§ 3102(b) and 3403, for the payment of these trust fund taxes once they pay employees only their net wages. Id. It is this liability that section 6672 enforces.

Farkas v. United States, 57 Fed. Cl. 134, 139 (2003), aff'd, 95 F. App'x 355 (Fed. Cir. 2004) (capitalization in original; footnotes omitted). The Farkas court noted that "Section 6672 holds delinquent employers personally responsible for 100% of the amount withheld from their employees." Id. As indicated in Jenkins v. United States, "[i]n imposing the obligation to collect these taxes on other than the actual taxpayer, Congress recognized that collectors might fail to set aside and pay over the taxes to the United States," and in cases where "the collector fails to remit the withheld taxes, the United States must, nevertheless, credit each taxpayer as if the funds were actually paid over." Jenkins v. United States, 101 Fed. Cl. 122, 130 (2011), aff'd, 484 F. App'x 511 (Fed. Cir. 2012). "To protect against such losses, the persons responsible for ensuring that the trust fund taxes are paid, who willfully fail to do so, may be held personally liable under section 6672 of the Code." Jenkins v. United States, 101 Fed. Cl. at 130; see also Waterhouse v. United States, 122 Fed. Cl. 276, 283 (2015).

As explained by the Federal Circuit in <u>Godfrey v. United States</u>:

The purpose of the 100 percent penalty provision "is to permit the taxing authority to reach those [persons] responsible for the corporation's failure to pay the taxes which are owing." <u>White v. United States</u>, 372 F.2d 513, 516, 178 Ct. Cl. 765 (1967). Though the legislative history is uninformative, "it is evident from the face of the section that [§ 6672] was designed to cut through the organizational form and impose liability upon those actually responsible for an employer's failure to withhold and pay over the tax." <u>See Pacific National Insurance Co. v. United States</u>, 422 F.2d 26, 31 and n.12 (9th Cir.), <u>cert. denied</u>, 398 U.S. 937, 90 S. Ct. 1838, 26 L. Ed. 2d 269 (1970). Accordingly, "the section is generally understood to encompass all those officers who are so connected with a corporation as to have the responsibility and authority to avoid the default which constitutes a violation of the particular Internal Revenue Code section or sections involved, even though liability may thus be enforced on more than one person."[19]

<u>Godfrey v. United States</u>, 748 F.2d at 1574-75 (quoting <u>White v. United States</u>, 178 Ct. Cl. 765, 372 F.2d 513, 516 (1967)) (bracket in original). As the <u>Farkas</u> court elaborated: "Thus, liability under section 6672 attaches only to those officers or directors with sufficient power and authority over the corporation that they may be considered a 'responsible person'—*i.e.,* one responsible for withholding the employees' taxes." <u>Farkas v. United States</u>, 57 Fed. Cl. at 140 (footnote omitted); <u>see also</u> <u>Waterhouse v. United States</u>, 122 Fed. Cl. at 283. In <u>Godfrey</u>, the Federal Circuit indicated:

The term "responsible person" is an invention of the courts, having no statutory definition or discussion in the legislative history. As the Supreme Court recently noted in <u>Slodov v. United States</u>, 436 U.S. 238, 98 S. Ct. 1778, 56 L. Ed. 2d 251: "The cases which have been decided under § 6672

_____

[19] The Tax Code at 26 U.S.C. § 6103(e)(9) provides that:

Disclosure of certain information where more than 1 person subject to penalty under section 6672.--If the Secretary determines that a person is liable for a penalty under section 6672(a) with respect to any failure, upon request in writing of such person, the Secretary shall disclose in writing to such person--

(A) the name of any other person whom the Secretary has determined to be liable for such penalty with respect to such failure, and

(B) whether the Secretary has attempted to collect such penalty from such other person, the general nature of such collection activities, and the amount collected.

26 U.S.C. § 6103(e)(9) (2012); <u>see also</u> <u>Jenkins v. United States</u>, 90 Fed. Cl. 585, 586 n.2 (2009).

> generally refer to the 'person required to collect, truthfully account for, and pay over any tax imposed by this title' by the shorthand phrase 'responsible person.' We use that phrase without necessarily adopting any of the constructions placed upon it in the decisions.

Godfrey v. United States, 748 F.2d at 1574 n.4 (quoting Slodov v. United States, 436 U.S. 238, 246 n.7 (1978)); see also Farkas v. United States, 57 Fed. Cl. at 140 n.7. The Federal Circuit in Godfrey concluded that

> a person is subject to a 100 percent penalty if he satisfies two separate statutory requirements. First, he must be under a duty to "perform the act in respect of which the violation occurs," (§ 6671(b)) and that duty is "to collect, truthfully account for, and pay over" any taxes (§ 6672). Such a person is a "responsible person". Second, the "responsible person" must have "willfully" failed to collect, truthfully account for, and pay over, or have "willfully" evaded or defeated the tax or tax payment. As the Claims Court correctly noted, both statutory requirements must be present for the 100 percent penalty to be imposed.

Godfrey v. United States, 748 F.2d at 1574 (citing McCarty v. United States, 437 F.2d 961, 967, 194 Ct. Cl. 42 (1971) (footnote omitted).

Both elements require a fact-specific inquiry by the court. In considering if the plaintiff was a responsible person, the court in Waterhouse v. United States stated, "the court focuses its factual inquiry into whether the plaintiff had the 'power to compel or prohibit the allocation of corporate funds.'" Waterhouse v. United States, 122 Fed. Cl. at 283 (quoting Godfrey v. United States, 748 F.2d at 1576). In addition, regarding the willfulness requirement, in Gann v. United States, the court stated "[t]he separate requirement that a responsible individual also have acted willfully in failing to withhold and/or remit the tax also presents a fact-intensive inquiry, calling for 'proof of a voluntary, intentional, and conscious decision not to collect and remit taxes thought to be owing.'" Gann v. United States, 121 Fed. Cl. 482, 489 (2015) (quoting Godfrey v. United States, 748 F.2d at 1577). Therefore, "[b]oth the responsible person analysis and the assessment of willfulness are fact-based determinations unique to the circumstances of each case." Jenkins v. United States, 101 Fed. Cl. at 131.

The burden of proof for these two elements, whether a plaintiff was a responsible person and whether a plaintiff additionally willfully failed to make and pay the requisite withholdings, rests with the plaintiff. As explained by a Judge of the United States Court of Federal Claims:

> When challenging a Section 6672 assessment, "[t]he taxpayer bears the burden of proving both that he was not a responsible person and that his failure to pay over the taxes was not willful." Stuart v. United States, 337 F.3d 31, 36 (1st Cir. 2003). To prevail, the taxpayer must establish by a preponderance of the evidence that the government's imposition of the

penalty against him is erroneous. <u>Farkas v. United States</u>, 57 Fed. Cl. 134, 140 (2003), <u>aff'd</u>, 95 Fed. Appx. 355 (Fed. Cir. 2004). The taxpayer carries the burden of proof both for his tax refund claim and against the defendant's counterclaim.

<u>Brinskele v. United States</u>, 88 Fed. Cl. 334, 339 (2009), <u>aff'd</u>, 397 F. App'x 662 (Fed. Cir. 2010); <u>see</u> <u>also</u> <u>Waterhouse v. United States</u>, 122 Fed. Cl. at 283; <u>Kobus v. United States</u>, 103 Fed. Cl. 575, 586 (2012) ("To prevail in a § 6672 case, the taxpayer must establish by a preponderance of the evidence that the government's imposition of the penalty against him is erroneous by proving that he was either not a responsible person or not willful."); <u>Farkas v. United States</u>, 57 Fed. Cl. at 140 ("The burden of production and persuasion to refute these two elements [whether plaintiff "was a responsible person" and whether plaintiff "willfully failed to make the requisite withholdings"] lies upon the plaintiff where, as here, the government has established a *prima facie* case by presenting the assessments made against the plaintiff."). "Once the Government establishes 'a *prima facie* case by presenting the assessments made against the plaintiff,' the 'burden of production and persuasion . . . lies upon the plaintiff' and must be shown by a preponderance of the evidence." <u>Waterhouse v. United States</u>, 122 Fed. Cl. at 283 (quoting <u>Farkas v. United States</u>, 57 Fed. Cl. at 140).

In addition, in a tax refund case, there is also a presumption of the correctness of the findings of the Commissioner of Internal Revenue. <u>See</u> <u>United States v. Fior D'Italia, Inc.</u>, 536 U.S. 238, 243 (2002) ("An 'assessment' amounts to an IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes. It is well established in the tax law that an assessment is entitled to a legal presumption of correctness – a presumption that can help the Government prove its case against a taxpayer in court."); <u>Conway v. United States</u>, 326 F.3d 1268, 1278 (Fed. Cir.) ("The ruling of the Commissioner of Internal Revenue enjoys a presumption of correctness and a taxpayer bears the burden of proving it to be wrong." (quoting <u>Transamerica Corp. v. United States</u>, 902 F.2d 1540, 1543 (Fed. Cir. 1990)), <u>reh'g</u> <u>denied</u> (Fed. Cir. 2003); <u>see</u> <u>also</u> <u>Stobie Creek Inv. LLC v. United States</u>, 608 F.3d 1366, 1381 (Fed. Cir. 2010); <u>Bubble Room, Inc. v. United States</u>, 159 F.3d 553, 561 (Fed. Cir. 1998) ("In a tax refund case, the ruling of the Commissioner of Internal Revenue is presumed correct."), <u>reh'g</u> <u>denied</u>, <u>en</u> <u>banc</u> <u>suggestion</u> <u>declined</u> (Fed. Cir. 1999); <u>Lima Surgical Assocs., Inc. v. United States</u>, 944 F.2d 885, 888 (Fed. Cir. 1991) ("[D]eterminations of the Commissioner of Internal Revenue are presumptively correct."); <u>Widtfeldt v. United States</u>, 122 Fed. Cl. 158, 163 (2015), <u>aff'd</u>, 2016 WL 5929834 (Fed. Cir. Oct. 12, 2016); <u>Diamond v. United States</u>, 115 Fed. Cl. 516, 524 (2014) (quoting <u>Danville Plywood Corp. v. United States</u>, 899 F.2d 3, 7 (Fed. Cir. 1990) (citing <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933) ("In a tax refund suit, 'the ruling of the [IRS] Commissioner enjoys a presumption of correctness and a taxpayer bears the burden of proving it to be wrong.'") (alternation in original); <u>Deseret Mgmt. Corp. v. United States</u>, 112 Fed. Cl. 438, 447 (2013) ("In a refund suit, the assessment made by the IRS is presumed to be correct, placing an obligation on the taxpayer to come forward with evidence to rebut a presumption of correctness."); <u>Ghandour v. United States</u>, 36 Fed. Cl. 53, 59 (1996) (quoting <u>Whiteside v. United States</u>,

26 Cl. Ct. 564, 566 (1992) (In a responsible person inquiry, "[a]s in any tax refund case, there is a 'strong presumption of the correctness of the findings' of the Commissioner.").

The taxpayer has the burden of rebutting the presumption of correctness, but also "the taxpayer has the burden of establishing entitlement to the specific refund amount claimed." Bubble Room, Inc. v. United States, 159 F.3d at 561; see also United States v. Janis, 428 U.S. 433, 440-41 (1976) ("In a refund suit the taxpayer bears the burden of proving the amount he is entitled to recover." (citing Lewis v. Reynolds, 284 U.S. 281, modified, 284 U.S. 599 (1932)); Helvering v. Taylor, 293 U.S. at 515 ("Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid."); Welch v. Helvering, 290 U.S. 111, 115 (1933) ("The Commissioner of Internal Revenue['s] . . . ruling has the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong." (citing Wickwire v. Reinecke, 275 U.S. 101 (1927)); Charron v. United States, 200 F.3d 785, 792 (Fed. Cir. 1999) ("Since the [plaintiffs] were seeking refunds of taxes they had paid, they have the burden of proving they are entitled to the amount sought."); Danville Plywood Corp. v. United States, 899 F.2d 3, 7-8 (Fed. Cir. 1990); Barenholtz v. United States, 784 F.2d 375, 381 (Fed. Cir. 1986); Widtfeldt v. United States, 122 Fed. Cl. at 163 (quoting Gingerich v. United States, 77 Fed. Cl. 231, 240 (2007) ("A 'plaintiff who is claiming a tax refund must prove [its] case by a preponderance of the evidence.'")); Christman v. United States, 110 Fed. Cl. 1, 5 (2013) ("In refund suits, there is no doubt that the plaintiff bears the burden of proof as to his or her entitlement to a tax refund." (citing Young & Rubicam, Inc. v. United States, 187 Ct. Cl. 635, 638, 410 F.2d 1233, 1238 (1969))); Okerlund v. United States, 53 Fed. Cl. 341, 356 (2002) ("As a general rule, the burden of proof is on the taxpayer in tax refund cases." (citing Welch v. Helvering, 290 U.S. at 115)), recons. denied, 2003 WL 1547563 (Fed. Cl. Feb. 14, 2003), aff'd, 365 F.3d 1044 (Fed. Cir. 2004).

In sum, to rebut the presumption of the Commissioner's correctness, "the taxpayer must come forward with enough evidence to support a finding contrary to the Commissioner's determination." Bubble Room, Inc. v. United States, 159 F.3d at 561. Stated otherwise, to overcome the presumption, the taxpayer has the burden of presenting "substantial evidence as to the wrongfulness of the Commissioner's determination." KFOX, Inc. v. United States, 206 Ct. Cl. 143, 151-152, 510 F.2d 1365, 1369 (1975); Arrington v. United States, 34 Fed. Cl. 144, 147 (1995), aff'd, 108 F.3d 1393 (Fed. Cir. 1997). The burden imposed on a plaintiff is both the burden of going forward and the burden of persuasion. Thus, a plaintiff first must come forward with enough evidence to support a finding contrary to the Commissioner's determination. See Transamerica Corp. v. United States, 902 F.2d at 1543; Danville Plywood Corp. v. United States, 899 F.2d at 7-8; Arrington v. United States, 34 Fed. Cl. at 147. Even after satisfying the burden of going forward, a plaintiff must still carry the ultimate burden of proof. See Transamerica Corp. v. United States, 902 F.2d at 1543; Danville Plywood Corp. v. United States, 899 F.2d at 8.

Responsible Person

The court first examines, in the context of 28 U.S.C. § 6672, if Mr. Noffke is a responsible person. Defendant argues that "Noffke is a Responsible Person at BOOMj

under Section 6672," whereas plaintiff argues that "Mark Noffke was not a responsible person for purposes of imposing the trust fund recovery penalty for Boomj's unpaid employment taxes for the Periods in Issue."

As indicated by the Federal Circuit, "[t]he cases which have been decided under § 6672 generally refer to the 'person required to collect, truthfully account for, and pay over any tax imposed by this title' by the shorthand phrase 'responsible person.'" Godfrey v. United States, 748 F.2d at 1574 n.4 (quoting Slodov v. United States, 436 U.S. at 246 n.7). As recently explained by a Judge of the United States Court of Federal Claims, "[u]nder § 6672, an individual is considered a responsible person 'if he retains sufficient control of corporate finances that he can allocate corporate funds to pay the corporation's other debts in preference to the corporation's . . . tax obligations.'" Waterhouse v. United States, 122 Fed. Cl. at 283 (quoting Brinskele v. United States, 88 Fed. Cl. at 346). As indicated in Jenkins v. United States, it is a "bedrock principle that the determination of whether a person is responsible 'is a matter of substance not form and is determined by the coincidence of status, duty and authority' - with the duty to ensure that taxes are paid flowing from authority that enables one to do so." Jenkins v. United States, 101 Fed. Cl. at 131 (quoting Cook v. United States, 52 Fed. Cl. 62, 68 (2002)). The Jenkins court elaborated that:

> While determining responsibility perforce requires consideration of the totality of the circumstances, the Federal Circuit has outlined a number of relevant considerations:
>
>> [A] person's "duty" under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds. It is a test of substance, not form. Thus, where a person has authority to sign the checks of the corporation or to prevent their issuance by denying a necessary signature or where the person controls the disbursement of the payroll or controls the voting stock of the corporation he will generally be held "responsible."
>
> Godfrey v. United States, 748 F.2d 1568, 1576 (Fed. Cir. 1984) (internal citations omitted); see also De Alto v. United States, 40 Fed. Cl. 868, 876 (1998). The inquiry thus looks through the—
>
>> mechanical functions of the various corporate officers, to determine the persons having 'the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations.' The inquiry required by the statute is a search for a person with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes.

Jenkins v. United States, 101 Fed. Cl. at 131-32 (quoting Godfrey v. United States, 748 F.2d at 1575) (footnote omitted). As indicated above, "liability under section 6672 attaches only to those officers or directors with sufficient power and authority over the corporation that they may be considered a 'responsible person'—*i.e.,* one responsible for withholding the employees' taxes." Farkas v. United States, 57 Fed. Cl. at 140 (footnote omitted). Stated differently, in Brinskele v. United States, the court explained:

> An individual is considered a responsible person "if he retains sufficient control of corporate finances that he can allocate corporate funds to pay the corporation's other debts in preference to the corporation's . . . tax obligations." Jefferson [v. United States], 546 F.3d [477,] 480 [(8th Cir. 2008)] (quoting Bowlen [v. United States], 956 F.2d [723,] 728 [(7th Cir. 1992)] (internal quotation marks omitted)). "As a general proposition it may be safely postulated that one who is the founder, chief stockholder, president, and member of the board of directors of a corporation . . . is rebuttably presumed to be the person responsible under [Section 6672]. . . ."

Brinskele v. United States, 88 Fed. Cl. at 345-46 (quoting Feist v. United States, 221 Ct. Cl. 531, 607 F.2d 954, 960 (1979) (quoting McCarty v. United States, 194 Ct. Cl. 42, 437 F.2d 961, 967–68 (1971))). As indicated in Salzillo v. United States, "the Federal Circuit and other courts have made clear that there can be more than one responsible person as 'liability attaches to all those under the duty set forth in the statute.'" Salzillo v. United States, 66 Fed. Cl. 23, 33 (quoting Harrington v. United States, 504 F.2d 1306, 1311 (1st Cir. 1974)), appeal dismissed, 140 F. App'x 254 (Fed. Cir. 2005). Instructions from a superior do not relieve a subordinate of potential liability under 26 U.S.C. § 6672. See Salzillo v. United States, 66 Fed. Cl. at 33 (quoting Brounstein v. United States, 979 F.2d 952, 955 (3d Cir. 1992)) ("[A] phalanx of opinions holding that '[i]nstructions from a superior not to pay taxes do not, however, take a person otherwise responsible under section 6672(a) out of that category.'").

As noted above, the responsible person inquiry is a fact-specific one. See Waterhouse v. United States, 122 Fed. Cl. at 283; Gann v. United States, 121 Fed. Cl. at 489. Turning to the facts of the above captioned case, plaintiff was the Chief Financial Officer and Executive Vice President of BOOMj. Mr. Noffke himself testified that he was "secretary-treasurer at a point in time" of BOOMj and the other various entities. Mr. Noffke also testified that "[i]nitially I owned a million shares of BoomJ as the private company."[20] The parties have stipulated, and Mr. Noffke confirmed during his trial testimony, that he had check signing authority on all of BOOMj's bank accounts and its subsidiaries' bank accounts. As noted above, the parties stipulated in advance of trial that "Plaintiff opened and closed bank accounts, merchant credit card holding accounts, credit cards and other financial accounts on behalf of BOOMj" and that "Plaintiff had the ability with respect to its banks to direct electronic transfers from BOOMj and its subsidiaries' bank accounts."

---

[20] Plaintiff indicated, however, that "[w]hile that is true, Mr. Noffke lost all of those shares after he pledged them as collateral for a loan that Boomj incurred and defaulted."

The parties also stipulated that "Plaintiff negotiated settlements with creditors and former employees on behalf of BOOMj." As indicated in the joint exhibits, in 2009 alone, more than 20 wire transfers between accounts worth hundreds of thousands of dollars were executed by Mr. Noffke. Plaintiff argues that, despite this authority, "Mr. Noffke had to obtain permission from Robert McNulty to write a check or order a wire transfer." Mr. Noffke also had hiring and firing authority within the accounting department, and testified that the "[t]he accounting department reported up through me." Testimony at trial revealed that Mr. Noffke supervised twenty four employees at BOOMj.

Mr. Noffke's responsibilities are consistent with the representations made on the IRS Form 4180, titled: "Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Taxes," the form signed by Mr. Noffke indicated yes to all of the following questions: "Determine financial policy for the business?" "Direct or authorize payments of bills/creditors?" "Open or close bank accounts for the business?" "Sign or counter-sign checks?" "Authorize payroll?" "Authorize or make Federal Tax Deposits?" and "Hire/Fire?" Form 4180 also asked: "During the time the delinquent taxes were increasing, or at any time thereafter, were any financial obligations of the business paid?" and the answer was "[s]tandard operational expenses to keep company in business," which the form stated were authorized by Mr. Noffke. In light the of the foregoing, defendant argues, "because Noffke admits to having broad authority in the company, coupled with corroborating testimonial and documentary evidence, this Court should find that he is a responsible person under § 6672."

Plaintiff concedes that "there is no dispute that Mr. Noffke did sign checks and wire transfer authorizations." Plaintiff responds that "the focus of the Government's case is on Mr. Noffke's ability to sign checks and his title as chief financial officer," which plaintiff states is insufficient for him to be a responsible person, arguing "[u]nder the Godfrey case, the mechanical duties of signing checks and preparing tax returns are not determinative of liability under Section 6672—the power to control the decision-making over the allocation of funds is the test." (citing Godfrey v. United States, 748 F.2d at 1575). Plaintiff continues:

> While it is true that Mr. Noffke was a signer on all of the bank accounts, that does not equate to his being a responsible person for purposes of Section 6672 of the Internal Revenue Code. Of particular significance is an analysis of Mr. Noffke's roles and authority at Boomj. It is undisputed that Mr. Noffke was a signer on Boomj's checking accounts. But that is where the analysis starts, not where it ends.

(citations omitted). The Federal Circuit in Godfrey instructed that the responsible person test is "a test of substance, not form." Although plaintiff's contends that, pursuant to Godfrey, "[t]he mechanical duties of signing checks and preparing tax returns are thus not determinative of liability under § 6672," Godfrey specifically identifies authority to sign checks as an indicia of being a responsible person: "Thus, where a person has authority to sign the checks of the corporation, or to prevent their issuance by denying a necessary signature, or where the person controls the disbursement of the payroll, or controls the

voting stock of the corporation, he will generally be held 'responsible.'" Godfrey v. United States, 748 F.2d at 1576 (citations omitted). The fact that Mr. Noffke, and not Mr. McNulty, held check signing authority, is a strong indicator of Mr. Noffke's responsibility. Moreover, there is no indication in the record, other than assertions at trial, that Mr. Noffke had to seek Mr. McNulty's approval to issue checks, such as no record of sign off approvals or memoranda in BOOMj's files limiting Mr. Noffke's authority. Mr. Noffke testified in response to the question, "are you referring to a written document in which you gave that authority or you limited your authority in some way and gave it to Bob [McNulty]?" Mr. Noffke testified that "[t]here is no document to that effect. But what there is is -- again, we talked about earlier, he approves the payroll. He approves what's being paid."

Regarding Form 4180, plaintiff argues that "[n]o representative of the IRS ever conducted an interview with Mr. Noffke regarding his potential personal liability for the trust fund recovery penalty with respect to Boomj,"[21] and that "Mr. Noffke received a fully completed Form 4180 that Joanne Stiff had prepared for him." Therefore, plaintiff tries to claim that "Mr. Noffke testified that he did not understand the purpose or import of the Form 4180 that he signed." Plaintiff further argues that "Mr. Noffke testified that he did not comprehend the purpose of the Form 4180. He stated that he thought only the person whose name was shown next to the question was the person identified as responsive to the question." Plaintiff, concludes that "[t]herefore, with an affirmative answer Mr. Noffke implicated himself, in some cases unintentionally." Crucially, although, plaintiff signed the Form 4180, on which, as noted by the defendant, "[j]ust above Noffke's signature is language which states that the individual declares that the information provided is 'true, correct, and complete.'" Furthermore, plaintiff's numerous years as a certified public accountant should have alerted him to the nature of the IRS form he was signing. Moreover, even when attempting to minimize his involvement with the preparation of Form 4180, plaintiff did not argue that the information was incorrect, only that the information was incomplete. After walking through the form with plaintiff's counsel, plaintiff had the following exchange on cross-examination:

> Q. Okay. So are you saying you signed this -- Mr. Shaff [plaintiff's counsel] just gave you a series of -- or went over a series of questions with you related to Section 3, responsibility here on the second page of Exhibit 7, and asked you -- I think he asked you would you have responded in this manner. Can you -- and you gave various responses indicating that some of these responses were incomplete; is that right?
>
> A. That's correct.
>
> Q. So -- but none of the responses were -- were wholly wrong when you checked yes. You just would have qualified them with an additional --

---

[21] Citing to Ms. Stiff's testimony at trial, plaintiff also notes that Ms. Stiff did not provide Mr. Noffke with a Privacy Act notice or a copy of IRS Notice 784, which is titled "Could You be Personally Liable for Certain Unpaid Federal Taxes?" Defendant does not challenge plaintiff's statement that no one from the IRS conducted an interview with Mr. Noffke regarding Form 4180.

A. That's correct.

Q. Okay. And did you indeed provide any narrative to the IRS at any point regarding BoomJ that made those qualifications?

A. Not that I recall.

Plaintiff argues that "the chief financial officer of Boomj, Mark Noffke lacked the authority to direct payments to creditors, a power that Robert McNulty, the chief executor [sic] officer, retained solely in himself." Although it is not disputed that Mr. McNulty, unlike Mr. Noffke, did not have check signing authority on BOOMJ's bank accounts, plaintiff claims that Mr. Noffke "was the instrumentality that caused checks to be issued and the designated bills to be paid, but no, he was not an ultimate authority that determined whose bills were paid and in what amounts."

The plaintiff uses the term "ultimate authority" a minimum of eighteen times in his post-trial filings. The court believes the language employed by plaintiff regarding the "ultimate authority" is not helpful. In Godfrey, the Federal Circuit stated that "[t]he inquiry required by the statute is 'a search for a person with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes.'" Godfrey v. United States, 748 F.2d at 1575 (quoting White v. United States, 178 Ct. Cl. 765, 372 F.2d 513, 516 (1967)) (emphasis added). As referenced above, however, Judge Allegra in Salzillo reminds that:

> Notwithstanding the "ultimate authority" language employed in Godfrey, the Federal Circuit and other courts have made clear that there can be more than one responsible person as "liability attaches to all those under the duty set forth in the statute." Harrington v. United States, 504 F.2d 1306, 1311 (1st Cir. 1974); see also, e.g., Lubetzky v. United States, 393 F.3d 76, 80 (1st Cir. 2004); Gephart, 818 F.2d at 473; Godfrey, 748 F.2d at 1574–75; Thibodeau v. United States, 828 F.2d 1499, 1503 (11th Cir. 1987); White, 372 F.2d at 516; Scott, 354 F.2d at 296. "[T]he statute expressly applies to 'any' responsible persons," one court has explained, "not just to the person **most** responsible for the payment of the taxes," noting further that "[t]here may be—indeed, there usually are—multiple responsible persons in any company." Barnett, 988 F.2d at 1455 (emphasis in original); see also Gephart, 818 F.2d at 476 ("[w]hile it may be that [other corporate officials] were **more** responsible than plaintiff, and exercised **greater** authority, this does not affect a finding of liability against the plaintiff" (emphasis in original)); Godfrey, 748 F.2d at 1575; Bolding, 565 F.2d at 663; White, 372 F.2d at 516; Ghandour, 36 Fed. Cl. at 61.

Salzillo v. United States, 66 Fed. Cl. at 33 (all emphasis in original); see also Jenkins v. United States, 101 Fed. Cl. at 132. Moreover, in its reply brief, plaintiff acknowledges, "[t]o clarify, the Plaintiff does not maintain that there can be only one responsible person

at an employer; only that at Boomj there was only one decision-maker with the ultimate authority to compel or prohibit the allocation of Boomj's funds, Robert McNulty." Plaintiff's main argument that Mr. Noffke was not a responsible person is because of the authority that, according to plaintiff, Mr. McNulty wielded at BOOMj.

Principally, plaintiff relies on the decision of Salzillo v. United States, 66 Fed. Cl. 23, in which the court found Mr. Salzillo not to be a responsible person, id. at 36, to support the position that Mr. Noffke was not a responsible person because of the role he described for Mr. McNulty and that Mr. McNulty testified to at trial. Plaintiff argues:

> The Salzillo case compares very closely with this case. Mr. Noffke had many responsibilities, but designating who to pay was clearly not one of them. Mr. McNulty called all the shots on whom to pay and Mr. McNulty had some very strongly held beliefs on the cash management of a start up company. There is an almost uncanny correspondence between the facts of the Salzillo case and the facts of this case. We do not dispute that there can be more than one responsible officer of a company, only that in the context of Boomj, like Star Foods in the Salzillo case, there was only one responsible officer, the chief executive officer.

By contrast, defendant argues that "[a]lthough Noffke has repeatedly joined forces with McNulty since their BOOMj debacle, Noffke attempts to hang blame solely on McNulty, and cites to Salzillo in support. But Salzillo supports defendant, not Noffke." In Salzillo, the corporation at issue, Star Foods Processing, Inc. (Star Foods), manufactured food products under government contracts for the federal government.   See id. at 24. As explained by Judge Allegra:

> The former president of Star Foods, Mr. L.C. Robbins, Jr., became involved with the company in 1983. At that time, Star Foods lacked sufficient capital to expand its business and Mr. Robbins purchased approximately two million dollars in equipment to lease to the company. The business, nonetheless, continued to flounder and, in or around March of 1986, shortly before Star Foods filed for bankruptcy, Mr. Robbins became directly involved in the business. During the summer of 1986, he assumed the title of president, remaining so through the end of the company's operations. As president, by his own admission, Mr. Robbins was the only person authorized to negotiate large corporate purchases, contracts, and loans; open and close corporate bank accounts; guarantee or co-sign corporate bank loans; and determine company financial policy.

Id. at 24-25 (footnote omitted). Subsequently, in 1995,

> the plaintiff, Jose Salzillo, joined Star Foods as a staff accountant, reporting to the then head financial officer, Mr. Felix Ramos. Mr. Ramos left around 1995. In 1996 or 1997 (the record does not disclose which), Adam Chessler, who Mr. Robbins described as a "money hunter," effectively became the

company's chief financial officer, albeit for less than a year. He owned around 5,000 shares in the company. Mr. Chessler had signature authority over the corporate bank accounts, prepared detailed financial reports for Mr. Robbins and the board of directors, and oversaw the department that prepared the payroll reports and taxes. Owing to the company's limited funds, Mr. Chessler frequently made recommendations to Mr. Robbins as to which bills should be paid—toward this end, Mr. Salzillo prepared for Mr. Chessler periodic reports reflecting the company's cash status and a list of creditors. Those reports were reviewed by Mr. Chessler and eventually forwarded to Mr. Robbins. After Mr. Chessler left, Mr. Kirk Nessman was hired, as a consultant, to acquire additional funding for the company. He left in mid to late 1998. From the time he was hired, through 1998, plaintiff successively reported first to Mr. Ramos and then to Mr. Chessler. During the periods when the position of chief financial officer was vacant, Mr. Salzillo reported directly to Mr. Robbins.

Id. at 25. As it related to the Salzillo plaintiff's responsibility,

[m]uch of the trial testimony focused, generally, on how Star Foods used its limited funds to pay particular creditors, and, specifically, on who controlled whether federal employment taxes would be paid. The record reveals that Mr. Salzillo frequently presented Mr. Robbins with cash balance reports and discussed with him the financial position of the company. Usually on Wednesdays, plaintiff presented Mr. Robbins with an accounts payable report, listing the outstanding creditors of the company and the amounts they were owed. After considering plaintiff's recommendations, Mr. Robbins would check off which creditors were to be paid, modifying the amount if less than the full amount owed was to be paid. Effectuating these decisions, Mr. Salzillo would then prepare or have prepared the appropriate checks, which would either be signed by Mr. Robbins, Mr. Salzillo or some other signatory; sometimes Mr. Salzillo or others would stamp Mr. Robbins' name thereon. The record reveals that this practice was relaxed for checks in smaller amounts, for essential items, such as utilities, or for other items regularly used in production. Larger checks, particularly those targeted to overdue debts unrelated to production, could not be issued without Mr. Robbins' express approval. Plaintiff testified that around two hundred checks were issued by company officials each month. During the periods in question, Mr. Robbins also made critical decisions regarding which employees would be asked to go without their pay; directed that health insurance premiums not be paid, causing the policy to lapse; and either directed that child support payments not be forwarded to the appropriate agencies or sent checks to such agencies that were returned for insufficient funds.

Id. at 26-27 (footnote omitted). Judge Allegra explained that "[o]n numerous other occasions, Mr. Salzillo urged Mr. Robbins to make payments to the IRS, with several such discussions escalating into shouting matches. While Mr. Robbins authorized some tax

payments, more frequently he chose to favor other creditors at the expense of the IRS, in an effort to keep the business afloat," but "[a]s a result of Mr. Robbins' decisions, either no or partial tax deposits were made for the last three quarters of 1999 and the first three quarters of the year 2000." Id. at 27. The Salzillo court also noted that:

> Cognizant that he could be held liable, plaintiff did not resign when the payroll taxes remained unpaid because, according to his testimony, he wanted to stay and ensure that Mr. Robbins made the payments after the company was sold. Ms. Sanchez testified that had plaintiff made any payments other than those directed to production related costs, Mr. Robbins would have threatened to fire him, but, given the company's dire circumstances, probably would not have done so. There is no indication that, during this period, plaintiff threatened to resign if the taxes were not paid.

Id. at 28 (footnote omitted).

The court agrees with plaintiff that there are some parallels between the above captioned case and the Salzillo case. In both instances the companies' limited funds resulted in the officers making decisions about who to pay or who not to pay and when. Plaintiff in the case currently before the court argues in its post-trial brief, "Robert McNulty knew the rules, knew that he called all the shots at Boomj, that he had to approve all payments, that he instituted that requirement to be able to manage the limited cash resources in a start-up company like Boomj and that he and he alone had the vision, the experience and the skill to make a company like Boomj successful." In both cases, the creditors, and not the IRS, were paid.  In both cases, Mr. Salzillo and Mr. Noffke, the individuals determined to be responsible people by the IRS, repeatedly raised the issue of non-payment to the IRS with their superiors, but the liabilities still remained unpaid. Mr. Noffke testified that the employment tax liabilities "were presented again to -- to Bob McNulty to make that call whether to make those payments or not." At trial in the above captioned case, Mr. Noffke also testified that he urged Mr. McNulty to pay the taxes, explaining during questioning with his attorney:

> Q. How often would you urge him to pay the federal employment taxes?
>
> A. It was front and center every time he received one of our sheets.
>
> Q. And how often was that?
>
> A. Traditionally weekly. We tried to make payments on Fridays.

Mr. McNulty confirmed Mr. Noffke's statements and testified that:

> Mark [Noffke] informed me on all payables, whether it's, you know, payroll taxes or whatever it might be. In this specific case, the sequence of events was pretty straightforward. Joanne [Stiff] came to me and said, hey, we

> have -- you know, we have an obligation to pay, you know, taxes, and we have an obligation for payroll, but we're going to be short. What should we do? And I said, you know, go ahead and, you know, pay the payroll, hold the taxes, and I'll call Mark.

In response to the question of whether Mr. Noffke "expressed his views that the -- the federal employment taxes should be paid." Mr. McNulty testified that "Yes, he did." Just as the plaintiff in Salzillo, Mr. McNulty testified that despite the failure to pay the IRS, "[h]e [Mr. Noffke] didn't threaten to quit, but he made it pretty clear that he was very unhappy about it." Mr. McNulty also made it clear to the court that he believed that regarding the payment of the employment taxes: "It's my responsibility. It's just that simple."

There remains crucial differences, however, between the plaintiff in the above captioned case and the plaintiff in Salzillo. As explained by Judge Allegra in Salzillo:

> Critically, the record reveals that on at least one occasion, plaintiff attempted to pay the IRS, but was thwarted by Mr. Robbins. Thus, in December 1999, without Mr. Robbins' knowledge or approval, plaintiff wrote and sent to the IRS a check in the amount of $50,000. Shortly after this check was mailed, Mr. Robbins asked Mr. Salzillo what the cash balance was in Star Foods' main account and was informed that the current balance was approximately between $53,000 and $57,000. When Mr. Robbins asked Mr. Salzillo to write a check for a load of meat needed for that week's production, Mr. Salzillo finally informed him that he could not, because the money in the account had been earmarked to cover the IRS check. Mr. Robbins became irate and ordered Mr. Salzillo to wire the money to the meat supplier instead. He admonished Mr. Salzillo never to write a check to the IRS again. An IRS ledger confirms that a check for $50,000 was received around this time, but that the check was returned for insufficient funds. As a further means of preventing Mr. Salzillo from sending out any checks without his permission, Mr. Robbins seized (or had seized) from Mr. Salzillo the signature stamp he had previously used to sign checks on Mr. Robbins' behalf.

Id. at 27-28. This was an important basis for Judge Allegra to find Mr. Salzillo was not a responsible person, because as Judge Allegra noted, "[t]he record reveals that Mr. Robbins so thoroughly controlled the extraordinarily limited finances of the company as to make it virtually impossible for Mr. Salzillo to send funds to the IRS without his actions being immediately detected and actual payment averted." Id. at 34. Judge Allegra reasoned:

> the record reveals that, long before Mr. Salzillo became the so-called "chief financial officer," Mr. Robbins was constantly apprised of the company's precarious cash position, and that, as day-to-day needs arose, he allocated the scarcely available funds to maintain and maximize production. As prime indication of the depth and effectiveness of his controls, the record reveals—and IRS records confirm—that when Mr. Salzillo attempted to pay

the IRS $50,000 without obtaining Mr. Robbins' permission, the latter quickly detected the unauthorized use of funds and shifted money from the account in question to prevent the check drafted by Mr. Salzillo from being cashed by the IRS.

Id. There is no such evidence in the above captioned case that Mr. Noffke ever considered paying the IRS directly in opposition to Mr. McNulty's wishes, despite having the check writing authority. In fact, regarding his ability to make payments to the IRS that Mr. McNulty did not approve, Mr. Noffke testified:

> Well, first of all, I didn't have the authority to do that. And could have -- you can say that I was embezzling money[22] to take care of my personal liability with the IRS. It would not cover the full debt that we were owed, and it would handle a certain portion of that. And the -- the liability would still be -- there would still be a -- a liability out there, maybe reduced by whatever money I was able to hypothetically write to.

Mr. McNulty was in an interesting position at trial, not having been identified by the IRS as a responsible person for the BOOMj tax liabilities, despite serving as the Chief Executive Officer and the Chairman of BOOMj. Mr. McNulty testified that Mr. Noffke did have the authority to send a payment to the IRS, but that he would not have approved it: "I mean, the question really shouldn't be does he [Mr. Noffke] have authority. Of course he has authority to write a check. It's, you know, who's telling him to pay them or not telling them to pay." Moreover, while Judge Allegra cites the rapid discovery of the check sent to the IRS and steps taken to prevent the check from being cashed by Mr. Robbins in Salzillo as evidence of the "prime indication of the depth and effectiveness of his controls," id., despite Mr. McNulty's statements that he was in control of the accounts, there is not clear evidence from the trial record that Mr. McNulty exercised the same level of authority or supervision as Mr. Robbins did in Salzillo. Most notably, Mr. McNulty did not have check signing authority at BOOMj, whereas Mr. Noffke did. Mr. McNulty explained this away, stating: "I mean, I didn't control it from writing the check, but I controlled it from discussing issues with Mark [Noffke] and directing them who should get paid and who shouldn't get paid." Unlike the plaintiff in Salzillo, Mr. Noffke appears to have had significant responsibilities at BOOMj, including, as explained above, "Plaintiff negotiated settlements with creditors and former employees on behalf of BOOMj" and Mr. Noffke executed more than 20 wire transfers between accounts worth hundreds of thousands of dollars in 2009. Mr. Noffke also supervised twenty four employees at BOOM and Mr. Noffke held hiring and firing within the accounting department, and as Mr. Noffke testified, the "[t]he accounting department reported up through me." Furthermore, Mr. McNulty's original role at BOOMj was the nonexecutive chairman of the company. Moreover, Mr. McNulty indicated that he "worked on the side of the business which was the business strategy, business model, and, you know, the direction of the company from that standpoint, and then raising capital for the company," and not day to day fiscal management. Therefore, the court believes that although similarities exist between the

---

[22] Plaintiff cites no authority for the proposition that payment to the IRS of taxes owed by BOOMj would be considered embezzlement by Mr. Noffke.

plaintiff in Salzillo, who was found not to be a responsible person, and Mr. Noffke, crucial differences are apparent, such that the court disagrees with plaintiff that "[t]here is an almost uncanny correspondence between the facts of the Salzillo case and the facts of this case."

Moreover, the record reflects that Mr. Noffke has continued to work for Mr. McNulty after BOOMj ceased operations. According to the joint stipulations of fact, "Mr. McNulty set up an arrangement whereby a subsidiary of BOOMj, called Kaching Kaching, Inc. ('KCKC') purchased certain assets of BOOMj for 20.8% of the shares of common stock of KCKC" and Mr. Noffke became the Chief Financial Officer of Kaching Kaching, Inc. while Mr. McNulty became the Chief Executive Officer. As indicated above, Kaching Kaching, Inc. also failed to pay the employment tax liabilities for the tax period ending on December 31, 2010, and the IRS assessed plaintiff with a trust fund recovery penalty for that failure. Despite that failure, Mr. Noffke continued to work for Mr. McNulty, most recently as the Chief Executive Officer of a company called Serendipity Cafe. In fact, Mr. Noffke has repeatedly continued to work for Mr. McNulty, despite the fact that plaintiff also claimed that he felt physically threatened by McNulty when they worked together at BOOMj. Jeffrey Aaronson, another BOOMj employee described McNulty's management approach as "[m]anagement by bullying."[23] Joanne Stiff labelled McNulty's management style as "not very good."[24]. Although not dispositive regarding plaintiff's status as a responsible person for BOOMj, the court is left to question the statements made at trial about the total control Mr. McNulty supposedly exercised or the feeling of being threatened by Mr. McNulty Mr. Noffke really felt, given that Mr. Noffke continued to accept new assignments from, and continued to work for, Mr. McNulty, including at the time of trial.

---

[23] The following exchange between plaintiff's counsel and Mr. Aaronson occurred regarding Mr. McNulty:

> Q. How were those disagreements resolved with Mr. McNulty?
>
> A. Mr. McNulty would put his foot down and say, I'm in charge, and this is what we're going to do.
>
> Q. Would Mr. McNulty use loud -- a loud voice?
>
> A. You could hear Mr. McNulty screaming sometimes from down the hall.
>
> Q. Would he use profanity?
>
> A. Frequently.

[24] Ms. Stiff further testified, "I don't know if it would be management by bullying, but I think it was more of unrealistic promises made and management based off of what he promised people. And I can't -- I don't think I've ever -- me personally, Bob's [Mr. McNulty] never bullied me. So I never got that feeling of that."

Plaintiff also quotes extensively from Judge Allegra's opinion in <u>Salzillo</u> to provide additional case support for the argument that plaintiff is not a responsible person. For example, plaintiff quotes this entire paragraph from the <u>Salzillo</u> decision:

> These cases, many of which are in this court, stress that while an individual's title or authority to sign checks may suggest a theoretical authority to effectuate such a payment, those features are not controlling if, based on the record as a whole, it preponderates that a given individual actually lacked the effective ability to pay taxes over to the IRS. <u>See</u>, <u>e.g.</u>, <u>United States v. Rem</u>, 38 F.3d 634, 647 (2d Cir. 1994) (the power to sign checks and the holding of corporate office "can exist in circumstances where the individual in reality does not possess significant control over corporate finances"); <u>Barrett</u>, 580 F.2d at 453 (despite having authority to sign checks, corporate director not "responsible officer" where corporate president controlled which creditors would be paid, including the IRS); <u>Bauer</u>, 543 F.2d at 149 ("Mere office holding of and by itself does not render one responsible for the collection and paying over of employee withholding taxes."); <u>De Alto</u>, 40 Fed. Cl. at 878 ("While the existence of another responsible person would not excuse plaintiff, [plaintiff's superior] retained such exclusive authority that plaintiff effectively had none when dealing with creditors"); <u>Williams v. United States</u>, 25 Cl. Ct. 682, 684 (1992) (officer that had written checks to creditors other than the IRS held not responsible where "though plaintiff had check writing authority and seemingly important titles, he lacked any independent authority within [the company]."); <u>Heimark v. United States</u>, 18 Cl. Ct. 15, 21–23 (1989) (treasurer not responsible person where responsibilities were ministerial and president of company was "autocratic" in the control of funds). As summarized by a leading commentator, these cases hold that "the concept of responsibility connotes more than corporate title" or a "theoretical authority" to pay over taxes, but rather "arises out of control actually exercised over the financial operations of the business." Michael I. Saltzman, IRS Practice and Procedure ¶ 17.07 (2005).

<u>Salzillo v. United States</u>, 66 Fed. Cl. at 35 (footnote omitted).

The facts of the cases cited in <u>Salzillo</u>, however, are not closely related to Mr. Noffke's situation. In <u>Barrett</u>, the United States Court of Claims explained that the <u>Barrett</u> plaintiff "had no responsibility for making up the payroll. She had no authority over payment of the salaries of company employees. Creditors did not ask for her when inquiring about being paid. She had no responsibility for the preparation of tax returns for the company, nor did she sign any such returns. Plaintiff did not negotiate company contracts, bill customers, order supplies or hire and fire employees." <u>Barrett v. United States</u>, 217 Ct. Cl. 617, 626, 580 F.2d 449, 453 (1978). In the above captioned case, Mr. Noffke ran the accounting department, supervising twenty four employees, and held hiring and firing authority. Furthermore, Mr. Noffke negotiated settlements with creditors and former employees on behalf of BOOMj. In <u>Bauer</u>, the Court of Claims identified the <u>Bauer</u>

plaintiff as "an outsider with respect to the financial and fiscal affairs of the company. He did not meet with representatives of the bank which was principally concerned with MATI's [Management and Technology, Inc.] financial condition." Bauer v. United States, 211 Ct. Cl. 276, 543 F.2d 142, 149 (1976). Mr. Noffke, by contrast was intimately familiar with the financial affairs of the company, responsible for public reporting duties and helping to negotiate the sale of Local Ad Link, BOOMj's most profitable subsidiary.

In De Alto, the United States Court of Federal Claims concluded that the De Alto plaintiff was not a responsible person because

> [t]here is no evidence here of routine payments signed by plaintiff. Defendant produced only two checks to creditors signed by plaintiff over the course of his years as vice-president. Both involved the limited emergency situations for which plaintiff was given authority by Mr. Housman to sign checks. Plaintiff's lack of authority is further demonstrated by his dismissal. Because he did not have the authority to direct payments or to prevent them, plaintiff was not a responsible person under section 6672.

De Alto v. United States, 40 Fed. Cl. 868, 878, appeal dismissed, 168 F.3d 1321 (Fed. Cir. 1998). Mr. Noffke, however, regularly made payments, and, was at times, the only check signing authority at BOOMj. Although Mr. Noffke and Mr. McNulty at trial claimed that Mr. McNulty had effective control over which payments to make and prioritize, in De Alto, that control was explicit. As noted by the De Alto court, Mr. Housman, the president and primary stockholder, issued a March 3, 1990, memorandum which

> explicitly limits the authority to approve payments to Mr. Housman. While the existence of another responsible person would not excuse plaintiff, Mr. Housman retained such exclusive authority that plaintiff effectively had none when dealing with creditors. The fact that Mr. Housman stated in a memorandum that plaintiff had 'full authority' related only to dealing with employees on behalf of Mr. Housman, not in dealing with creditors or deciding on how funds were to be disbursed.

Id. at 878. Mr. Noffke, by contrast, executed numerous wire transfers for the various company accounts totaling more than six figures. Likewise, Mr. Noffke testified in response to the question, "are you referring to a written document in which you gave that authority or you limited your authority in some way and gave it to Bob [McNulty]?" Mr. Noffke testified that "[t]here is no document to that effect. But what there is is -- again, we talked about earlier, he approves the payroll. He approves what's being paid."

In Williams, the United States Claims Court noted that:

> Plaintiff controlled no voting stock in WBC [Williams Bridge Company]. He could not prevent issuance of a check by denying his signature and he had no authority within the corporation to sign checks to creditors unless authorized by his father. Plaintiff had no significant independent power over

financial matters. He was the submissive son of a domineering father. He was obliged to do, and he did, whatever his father instructed.

Williams v. United States, 25 Cl. Ct. 682, 684 (1992). Moreover, although the Williams plaintiff was in name the vice president, treasurer, and officer manager, "he had little independent authority and at all relevant times was kept on a very 'short leash.' His supervisory authority was limited to two office employees-a secretary and a bookkeeper-and even that power was subject to his father's override." Id. at 683-84. Mr. Noffke, on the other hand, had substantial authority over the accounting department and the SEC compliance at BOOMj. Furthermore, during the events at issue when the Williams Bridge Company failed "to segregate and pay over to the IRS social security and income taxes withheld from employees of the Williams Bridge Company (WBC) during the last quarter of 1984 and the first half of 1985," id. at 682, the Williams plaintiff was in his twenties, whereas Mr. Noffke at the time of the events in question regarding at BOOMj, had been in the accounting industry for decades.

The court does not believe, as found in Heimark v. United States, that Mr. Noffke's responsibilities were ministerial.  The Heimark court explained that the Heimark

> plaintiff alone authorized no expenditures, made no memorable decisions, issued no general orders, and exerted no particular influence over the course of events at GSI [Getting Services, Inc.]. Neither his uncompensated position as Treasurer nor his position of Comptroller, for which he received 'take home' pay of $11,506.65 in 1979, conferred upon plaintiff a status to even significantly participate in, let alone control, the allocation of GSI funds.

Heimark v. United States, 18 Cl. Ct. 15, 21 (1989). Moreover, the plaintiff in Heimark "enjoyed no particular respect or deference amongst the employees of GSI by virtue of his title as Treasurer or his position as Comptroller. To the contrary, plaintiff supervised no one at GSI other than, to a limited degree, a single secretary." Id. As noted above, Mr. Noffke supervised the accounting department, supervising twenty four employees, and held hiring and firing authority. Furthermore, Mr. Noffke held substantially responsibility for BOOMj's SEC compliance, regarding which plaintiff testified, "I would estimate basically 80 percent of my duties were in the public reporting framework." Additionally, as defendant points out, citing Heimark v. United States, 18 Cl. Ct. at 19, "[a]lso telling are Noffke's choices following the company's demise. Unlike the plaintiff in Heimark, Mr. Noffke did not resign from Boomj.com when payroll taxes were not paid. Instead, he helped McNulty fold BOOMj into a new business scheme, joined McNulty in this endeavor—which also quickly failed—and joined McNulty for another business venture that remains in place until today." In sum, none of the cases cited in Salzillo, nor Salzillo itself, supports plaintiff's contention that Mr. Noffke was not a responsible person at BOOMj. Despite plaintiff's protestations to the contrary, after considering the trial testimony, trial exhibits, and all the arguments in the parties' briefs, as well as the relevant case law, the court determines that Mr. Noffke is a responsible person for purposes of 26 U.S.C. § 6672.

Willfulness

A individual being a responsible person, however, is insufficient to trigger liability under 26 U.S.C. § 6672. As indicated above, the United States Court of Appeals for the Federal Circuit indicated that "a person is subject to a 100 percent penalty if he satisfies two separate statutory requirements. First, he must be under a duty to 'perform the act in respect of which the violation occurs,' (§ 6671(b)) and that duty is 'to collect, truthfully account for, and pay over' any taxes        (§ 6672). Such a person is a 'responsible person.'" Godfrey v. United States, 748 F.2d at 1574 (footnote omitted). The Federal Circuit continued: "Second, the 'responsible person' must have 'willfully' failed to collect, truthfully account for, and pay over, or have 'willfully' evaded or defeated the tax or tax payment," and "both statutory requirements must be present for the 100 percent penalty to be imposed." Id. (citing McCarty v. United States, 194 Ct. Cl. 42, 437 F.2d at 967). Having determined that Mr. Noffke is a "responsible person," the court turns to the second requirement, the willfulness requirement. Although defendant argues that "Noffke willfully failed to pay BOOMj's employment taxes," plaintiff has not made arguments specific to the willfulness element of 26 U.S.C. § 6672.

As noted in Farkas v. United States "as the text makes clear, section 6672 includes a *scienter* element requiring that the responsible person must have 'willfully' failed to make the requisite withholding." Farkas v. United States, 57 Fed. Cl. at 140 (emphasis in original). Indeed, 26 U.S.C. § 6672(a), specifically mentions the word willfully twice:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a) (emphasis added); see also Jenkins v. United States, 101 Fed. Cl. at 130; Brinskele v. United States, 88 Fed. Cl. at 338. The Federal Circuit has elaborated that "'the failure to pay the overdue taxes [is] willful has been seen . . . as calling for proof of a voluntary, intentional, and conscious decision not to collect and remit taxes thought to be owing—and not as requiring a special intent to defraud or deprive the Government of monies withheld on its account.'" Godfrey v. United States, 748 F.2d at 1576-77 (quoting Scott v. United States, 173 Ct. Cl. 650, 354 F.2d 292, 295 (1965) (alternations in original)). The willfulness requirement "does not, however, require a showing of specific intent to defraud or otherwise of an evil motive." Gann v. United States, 121 Fed. Cl. at 489 (citing Godfrey v. United States, 748 F.2d at 1577); see also Godfrey v. United States, 748 F.2d at 1577 (quoting Scott v. United States, 173 Ct. Cl. 650, 354 F.2d at 295) ("The focus of inquiry is rather 'on the deliberate nature of the individual's election not to pay over the money and the circumstances of that refusal.'").

The Court of Federal Claims in Kobus explained that:

> There are two basic ways that a person can willfully fail to pay over withholding taxes: a person acts willfully if the employer has funds to pay the taxes and the person either (1) knowingly chooses not to pay over the withholding taxes or (2) acts with a reckless disregard of a risk that the withholding taxes will not be paid.

Kobus v. United States, 103 Fed. Cl. at 588 (citing Godfrey v. United States, 748 F.2d at 1577); see also Godfrey v. United States, 748 F.2d at 1577 (quoting Mazo v. United States, 591 F.2d 1151 (5th Cir.), cert. denied, 444 U.S. 842 (1979)) ("The willfulness requirement is satisfied 'if the responsible person acts with a reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government, . . . such as by failing to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted.'"); Gann v. United States, 128 Fed. Cl. at 401-402; Waterhouse v. United States, 122 Fed. Cl. at 285.

As noted above, "[t]he separate requirement that a responsible individual also have acted willfully in failing to withhold and/or remit the tax also presents a fact-intensive inquiry, calling for 'proof of a voluntary, intentional, and conscious decision not to collect and remit taxes thought to be owing.'" Gann v. United States, 121 Fed. Cl. at 489 (quoting Godfrey v. United States, 748 F.2d at 1577). As previously indicated, although plaintiff states willfulness is a question presented in this case in his submissions to the court, plaintiff does not separately address the willfulness requirement. Notably, plaintiff begins its post-trial brief: "The only issue in this case is whether plaintiff, Mark V. Noffke, was a responsible person within the meaning of 26 U.S.C. §6672(a), the trust fund recovery penalty, of Boomj.com, Inc. during each of the four quarters of 2009." (internal citations omitted). Additionally, the only reference to willfulness in the plaintiff's reply brief is to argue: "Awareness goes to willfulness, not responsibility."

The parties have stipulated that "BOOMj failed to deposit its employment tax withholdings in the first, second, third and fourth quarters of 2009. Plaintiff was aware at the time of the delinquencies of BOOMj's failure to meet its employment tax obligations." In addition, the trial testimony demonstrated that Mr. Noffke had actual knowledge of outstanding liabilities. Mr. Noffke himself testified that "notices come from the IRS notifying you of the deficiencies," and that BOOMj generated weekly reports identifying liabilities, including the tax payment requirements and deficiencies. Moreover, Mr. Noffke confirmed with both plaintiff's counsel and defendant's counsel during trial his knowledge of those liabilities. With defendant's counsel, Mr. Noffke discussed the conversations about not paying the employment tax liabilities with Mr. McNulty:

> Q. We've talked a lot today about Mr. McNulty and what he would say to you when you would have these conversations about wanting to pay the employment tax liabilities, and I think you said he was always saying that money was just around -- around the corner; is that right?

A. That's correct.

Q. And this is referring -- you heard how many times in your work with Mr. McNulty?

A. Many -- many times.

Q. Over the course -- I guess beginning in 2008 when you first --

A. Beginning in 2008 when we first incurred missing the payroll liability the first time. And actually that happened in 2008, the promise was fulfilled. We were able to pay those payroll taxes in 2008 in 2009.

Q. Right. But the same was not true of the employment tax liabilities incurred in 2009.

A. That's correct.

With plaintiff's counsel Mr. Noffke had the following exchange:

Q. Would you say that you urged Mr. McNulty to pay the federal employment taxes?

A. Yes, I would.

Q. How often would you urge him to pay the federal employment taxes?

A. It was front and center every time he received one of our sheets.

Q. And how often was that?

A. Traditionally weekly. We tried to make payments on Fridays.

· · ·

Did the tenor of your discussions with Mr. McNulty change from the beginning of 2009 to the end of 2009 regarding employment taxes?

A. Yes, it did.

Q. Would you tell the Court.

A. It got a little bit more intense because of -- the dollar amount was getting extremely high. And Bob -- again, it's always the next deal. We heard him talk about, I would do this again. I -- you know, he -- he's still believe -- I mean, I'm looking at more realistic. I'm looking at what are our liabilities and how do you take care of the various vendors, suppliers, payroll, you know,

trust fund obligations to -- basically to the point of, you know -- you know, is this money ever going to come in? When does it stop?

Mr. Noffke also testified about speaking with Mr. McNulty as follows:

[I]f he asked me what needed to be paid, it was going to be payroll taxes. But that next step, I would give him my recommendations.

Q. After he said we're not paying those right now.

A. That's correct.

Mr. McNulty also confirmed that he discussed the unpaid taxes with Mr. Noffke.  As indicated in this following exchange with plaintiff's counsel:

Q. And he expressed his views that the -- the federal employment taxes should be paid.

A. Yes, he did.

Q. Yet they were not.

A. Correct. It's my responsibility. It's just that simple.

The parties have stipulated that creditors were paid with available funds while BOOMj had outstanding employment tax liabilities with the IRS, and Mr. Noffke also testified at trial that other vendors were paid even though there were the outstanding tax liabilities, which, as demonstrated by Mr. Noffke's own testimony, Mr. Noffke was aware of the unpaid tax liabilities. Referring to the cost of BOOMj's servers, Mr. Noffke had the following exchange with his attorney:

Would that be a bill that Mr. McNulty would give priority to?

A. Yes, that would be. Anything to keep the business up and running was his priority.

Q. When you would have these discussions with Mr. McNulty, would you make recommendations as to what should be paid?

A. If I felt – we're in this court right now of what type of listening powers I had with him. My whole priority, and -- and I -- I do it every day. I -- on the taxes, it was so important, and that's why we put it front and center for him that that is a responsibility of the company. I was -- working with this company and this operation and being in that position is -- is -- is a very difficult position for myself because of recognizing the exposure and the

potential of what we're -- you know, what the company had, the liability there that was outstanding.

Although Mr. Noffke continually painted Mr. McNulty as the sole decision maker, as the signatory on the accounts, it was Mr. Noffke who made the payments to the vendors.  As noted above, in 2009, Mr. Noffke made numerous wire transfers, and at trial he testified that "[o]n certain large amounts to some of our vendors, I would do the wire transfer." As Mr. Noffke had knowledge of, and understood, the tax liability, as well as the possibility of personal liability, and he, nonetheless, himself paid out to creditors despite the outstanding payments due the IRS, Mr. Noffke perfectly fits the definition for acting willfully. See Kobus v. United States, 103 Fed. Cl. at 588 ("[A] person acts willfully as a matter of law if, after he has actual knowledge of a tax deficiency, he uses unencumbered funds to pay other creditors instead of the United States.").

In addition, as the parties have stipulated, "Plaintiff signed a Form 4180 interview form regarding his role at BOOMj and his knowledge of the unpaid liabilities on May 18, 2010. Although discussed above, most notable about the Form 4180, is the question: "During the time the delinquent taxes were increasing, or at any time thereafter, were any financial obligations of the business paid," to which the answer was yes, with the explanation "Standard operational expenses to keep company in business." In response to the question: "Who authorized them to be paid?" the Form 4180 stated: "Mark Noffke." Defendant argues that, "[a]s Noffke was intimately aware of the unpaid tax liabilities to the IRS, and had the ability to sign a check or wire funds to the IRS to satisfy that debt but did not do so, he has acted willfully under § 6672, and this Court should rule accordingly."[25] Considering all the evidence introduced at trial, including the exhibits and

---

[25] In addition, as a long time Chief Financial Officer and certified public accountant, Mr. Noffke was aware of both of the requirements of 26 U.S.C. § 6672 and the ability of the government to recover the nonpayment of employment taxes. In fact, Mr. Noffke previously had been responsible for paying payroll taxes as Chief Financial Officer of National Storm Management. Mr. Noffke also testified at trial on cross-examination:

Q. [H]ow long have you known about 6672 or the trust fund recovery penalties? When did you learn about that ability of the government?

A. Most likely in college.

Q. And you said -- testified earlier that when Mr. Shaff showed you the Form 4180, that you -- you knew what that was for; is that right?

A. That's correct.

Q. So you understood that the Form 4180 is a tool that the Internal Revenue Service uses to assess someone's or to make a determination regarding someone's status as a responsible officer of a company and their willfulness regarding the nonpayment of employment taxes; is that right?

the testimony, the court agrees with defendant and concludes that Mr. Noffke willfully failed to pay the obligated employment taxes.  Based on the record before the court, the court finds that plaintiff knowingly chose not to pay over the withholding taxes. See Kobus v. United States, 103 Fed. Cl. at 588 ("[A] person acts willfully if he has actual knowledge of a past or present withholding-tax deficiency and he voluntarily chooses not to pay the United States. More specifically, a person acts willfully as a matter of law if, after he has actual knowledge of a tax deficiency, he uses unencumbered funds to pay other creditors instead of the United States." (footnote and citation omitted)). As plaintiff is both a responsible person and willfully failed to pay the required taxes, plaintiff is liable under 26 U.S.C. § 6672.

## CONCLUSION

As noted in Jenkins v. United States: "An individual against whom the IRS has made a section 6672(a) assessment ordinarily has the burden of proving, by a preponderance of the evidence, that at least one of the composite elements of liability under that section is absent. And that burden squarely falls on plaintiff here." Jenkins v. United States, 101 Fed. Cl. at 131 (citations omitted).  Mr. Noffke has failed to meet the burden to prove he was not a responsible person. Further, plaintiff has not demonstrated that the failure to pay the required taxes was not willful. Therefore, Mr. Noffke is both a responsible person and willfully failed to pay BOOMj's employment taxes for 2009. The court understands that Mr. Noffke is in a difficult position, as he was identified as the responsible person by the IRS, instead of Mr. McNulty, who, in the court's view, may have had an equal, if not greater, responsibility to make the payments to the IRS, but who set himself up in the company without check signing authority on BOOMj's accounts, leaving that authority to others, including Mr. Noffke. This, however, does not relieve Mr. Noffke of his responsibilities, which plaintiff plainly understood, and the IRS sought to recover payment from Mr. Noffke, and not Mr. McNulty, for unexplained reasons. Therefore, plaintiff's complaint is **DISMISSED**. Defendant's counterclaim is **GRANTED**. A schedule

---

A. That's correct.

Q. And that's something you've understood for a long time. You've known about 6672 for a long time; is that right?

A. Don't know if I referred to it by the code number, but that officers of companies could become liable for payroll taxes.

Q. And you -- when you took on this -- this role as CFO of -- of BoomJ, did you understand that that was a potential -- that -- that a role such as that could carry a potential personal liability should there be nonemployment -- nonpayment of employment taxes?

A. Yes, I did.

for further proceedings to resolve the amount owed to defendant will be set by separate Order.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**